FILED
FEBRUARY 4, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE HERKERT, )
on behalf of plaintiff and a class, )
)
Plaintiff, )
)
v. )
)
MIDLAND FUNDING NCC-2 CORPORATION; )
MIDLAND CREDIT MANAGEMENT, INC.; )
and ENCORE CAPITAL GROUP, INC., )
)
Defendants. )

**08 C 760**

**JUDGE CASTILLO
MAGISTRATE JUDGE SCHENKIER**

## COMPLAINT – CLASS ACTION

### MATTERS COMMON TO MULTIPLE CLAIMS

#### INTRODUCTION

1. Plaintiff Nicole Herkert brings this action to secure redress against unlawful collection practices engaged in by defendants Midland Funding NCC-2 Corporation ("NCC"), Midland Credit Management, Inc. ("MCM"); and Encore Capital Group, Inc., formerly known as MCM Capital Group, Inc. ("Encore"). Plaintiff alleges violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA"), and state law.

2. The FDCPA broadly prohibits unfair or unconscionable collection methods; conduct which harasses, oppresses or abuses any debtor; and any false, deceptive or misleading statements, in connection with the collection of a debt; it also requires debt collectors to give debtors certain information. 15 U.S.C. §§1692d, 1692e, 1692f and 1692g.

3. Plaintiff contends that defendants threaten and bring lawsuits against Illinois residents on time-barred credit card debts.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. §§1331, 1337 and 1367 and 15 U.S.C. §1692k (FDCPA).

5. Venue in this District is proper because defendants' collection activities took place in this District.

## PARTIES

### Plaintiff

6. Plaintiff Nicole Herkert resides in the Northern District of Illinois.

### Midland Funding NCC-2 Corporation

7. Defendant Midland Funding NCC-2 Corporation ("NCC") is a Delaware corporation. Its principal place of business is 8875 Aero Drive, Suite 200, San Diego, CA 92123. Its address for service of process is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

8. Defendant NCC is in the business of taking title to charged-off debts allegedly owed by consumers, including large amounts of credit card debts, for a small fraction of face value and enforcing the debts against the consumers.

9. Defendant NCC has been the plaintiff in more than 1,000 collection actions against Illinois residents.

10. Defendant NCC is a "debt collector" as defined in the FDCPA.

11. Defendant NCC transacts business in Illinois.

### Midland Credit Management

12. Defendant MCM is a Kansas corporation with its principal place of business at 8875 Aero Drive, Suite 200, San Diego, CA 92123. MCM transacts business in Illinois. Its

registered agent and office are Illinois Corporation Service Co., 801 Adlai Stevenson Drive, Springfield, IL 62703.

13. Defendant MCM is a collection agency and collects the charged-off debts held in the names of NCC and other subsidiaries of Encore (described below).

14. Defendant MCM is a "debt collector" as defined in the FDCPA.

### Encore

15. MCM and NCC are under common ownership. Both are subsidiaries of Encore, a publicly traded Delaware corporation, with offices at 8875 Aero Drive, Suite 200, San Diego, CA 92123.

16. Encore describes itself as "a leading accounts receivable management firm" and a "purchaser and manager of charged-off consumer receivables portfolios." (Form 8-K filed by Encore with the SEC on March 3, 2005).

17. On March 10, 2005, Encore stated to public investors that it is a "50 year old purchaser and manager of consumer receivables portfolios." (Form 8-K filed by Encore with the SEC on March 10, 2005).

18. Encore "acquires its receivable portfolios at deep discounts from their face values using its proprietary valuation process that is based on the consumer attributes of the underlying accounts." (Form 10-K filed by Encore with the SEC for the year ending December 31, 2006, original p. E). By "deep discount" is meant 3.0 to 3.36% of face value. (*Id.*, original p. 28).

19. Encore states that it is responsible for developing collection strategies. Thus, on March 3, 2005, Encore stated to public investors that:

> Our fourth quarter performance capped a very strong year for Encore, as we generated record levels of collections, revenues, and earnings per share.... We were able to achieve this strong growth despite scaling back on our purchasing of new

portfolios throughout much of 2004 in response to less attractive pricing in the marketplace. Total purchases during 2004 were $103.4 million compared to $89.8 million in 2003. We continue to effectively develop alternative collection channels, such as legal and agency outsourcing, which increase our ability to penetrate our portfolios further....

The statement was made by Carl C. Gregory, III, then-Vice Chairman and CEO of Encore Capital Group, Inc. (Form 8-K filed by Encore with the SEC on March 3, 2005).

20. Encore is also responsible for raising money to purchase the charged-off debts.

21. Encore has various subsidiaries, such as NCC, take title to the debts it purchases.

22. On March 3, 2005, Encore CEO Gregory stated in an earnings conference call:

It's notable that we achieved this strong growth despite scaling back on our purchases of new portfolios for the better part of 2004, because of a less attractive pricing environment. As we have mentioned many times, one of our competitive advantages is our varied business model that makes use of several different collection channels. During the fourth quarter we continued to see increased production out of our legal channel and our contingent agency outsourcing channel, which was developed earlier in 2004. For the full year, our collections through alternative channels, with the exception of the sales channel, more than doubled.

Turning to the purchasing market, our purchases for the first three quarters of the year were relatively modest, because of what we deemed to be a lack of opportunities that met our high standards. The market continues to be highly competitive, and it's looking like it could remain that way for quite a while. Accordingly, we have adjusted our strategy to reflect the current environment. We determined that we should not bypass profitable opportunities simply because they could not generate the high level of returns we have typically demanded, there are sufficient opportunities to purchase portfolios that can be nicely profitable for the Company. And in the current environment, it's in our best interest to acquire these portfolios rather than waiting for prices to come down.

With that being said, we invested $46.1 million in new portfolios in the fourth quarter, at an average purchase price of 3.86 percent of face value. Almost all of these purchases were credit card portfolios and that's where we found the most

attractive opportunities in the fourth quarter. These purchases were made with our former credit facility that expired at the end of the year. We were able to modify the terms of that credit facility during the fourth quarter, to put a ceiling on the total interest that we will have to pay on these portfolios. The lower interest expense associated with these portfolios will help offset the higher prices, and the resulting lower collection multiples and enable these portfolios to still generate nice profits for the Company.

23. On August 3, 2004, Encore CEO Gregory stated in another earnings call:

We believe our business model is especially well-suited to this changing environment. Specifically, our business model emphasizes customer-level rather than portfolio-level analytics, innovative and flexible collection processes and conservative accounting.

The keystone to everything we do is customer-level analytics -- understanding the individual customer and his changing ability to pay. Prior to purchase and throughout our ownership, we analyze the individual customer's ability and willingness to pay. We are always asking the same question -- can this particular customer pay us all or some of what he owes now? By focusing on the customer and information about him, we are able to move comfortably across various asset types as well as the portfolio ages or time since charge-off. In this process, a score is generated for every single account we own and the score is refreshed quarterly to ensure that it maintains its accuracy.

The second major aspect of our business model is our use of innovative collection strategies that are driven by the underlying collectibility score of each customer. In other words, to fully benefit from the new information we are generating about the individual customers, we have to be able to apply different collection strategies as appropriate, or at least be able to apply the traditional approaches in new ways that will be more effective.

We now have eight unique revenue channels that each contribute more than $1 million per month in collections, including direct mail, balance transfer, external legal, and our recently developed agency outsourcing strategy.

24. Encore's involvement in the collection process is such as to make it a "debt collector" as defined in the FDCPA.

25. All of the defendants herein are under common control as well as ownership, with common or overlapping officers and directors.

## FACTS RELATING TO PLAINTIFF HERKERT

26. On or about November 28, 2007, suit was filed in the name of NCC against plaintiff Herkert in the Circuit Court of Cook County, case 07 M1 218178, seeking to collect a supposed credit card debt incurred for personal, family or household purposes.

27. Attached to the complaint was a purported affidavit ("Form 409") from an employee of MCM, "servicer of this account on behalf of Midland Funding NCC-2 Corp."

28. On information and belief, MCM directed or caused the filing of the lawsuit.

29. The complaint did not have attached to it any contract signed by the putative debtor.

30. The complaint did have attached to it a supposed unsigned "cardmember agreement" (identical to that attached to the complaint against Jackson) which stated that "we may change the terms of this Agreement from time to time" by notice, without a signature being required.

31. The "cardmember agreement" stated that it was governed by Delaware law. Delaware law authorizes a credit card issuer to change the terms from time to time by notice, without a signature being required, unless a cardmember agreement disclaims this right. 5 Del. C. §952.

32. The complaint and attached documents are attached hereto as Appendix A.

33. The "Form 409" affidavit gave a delinquency date, which was more than five years prior to the filing of the action.

34. Defendants maintain computerized records of payments on purchased accounts.

35. The computerized records relating to the account that was the subject of Appendix A did not show any payment within five years prior to the filing of the action.

36. Plaintiff Herkert appeared and defended the action.

37. On January 17, 2008, NCC nonsuited it.

## FACTS – GENERAL

38. The alleged debt that was the subject of <u>Appendix A</u> was no longer enforceable through legal action as a result of the expiration of the five-year statute of limitations, 735 ILCS 5/13-205. *Parkis v. Arrow Financial Services*, 07 C 410, 2008 U.S. Dist. LEXIS 1212 (N.D. Ill., Jan. 8, 2008); *Weniger v. Arrow Financial Services*, 03 C 6213, 2004 U.S. Dist. LEXIS 23172 (N.D. Ill., Nov. 18, 2004); *Nicolai v. Mason*, 118 Ill. App. 3d 300; 454 N.E.2d 1049 (5th Dist. 1983).

39. It is the policy and practice of defendants to file suit or cause suit to be filed against Illinois residents on alleged credit card debts where the date of delinquency and the date of last payment, according to defendants' records, are both more than five years prior to filing.

40. It is the policy and practice of defendants to file suit or cause suit to be filed against Illinois residents on alleged credit card debts where the complaint does not have attached to it a written contract bearing the signature of the putative debtor. On information and belief, based on examination of multiple files, in no or virtually no case do defendants attach a signed contract.

41. It is the policy and practice of defendants to file suit or cause suit to be filed against Illinois residents on alleged credit card debts where the contract terms may be altered by notice without a signature by the putative debtor.

42. Under Illinois law, if a complaint does not have a signed contract attached to it, it is presumptively subject to the five-year statute of limitations for contracts not wholly in writing. *Barnes v. Peoples Gas Light & Coke Co.*, 103 Ill.App.2d 425, 428, 243 N.E.2d 855 (1st Dist. 1968); *O.K. Electric Co. v. Fernandes*, 111 Ill.App.3d 466, 444 N.E.2d 264, 266-67 (2nd Dist.

1982).

43. Under Illinois law, if a purported contract may be altered by notice without a signature, with either failure to object or continued dealings constituting acceptance of the new terms, it is subject to the five-year statute of limitations for contracts not wholly in writing. *Toth v. Mansell*, 207 Ill. App. 3d 665, 669, 566 N.E.2d 730, 733 (1st Dist. 1990); *Classified Ventures, Inc. v. Wrenchead, Inc.*, 06 C 2373, 2006 U.S. Dist. LEXIS 77359 (N.D. Ill., Oct. 11, 2006).

44. Notwithstanding this, it is the policy and practice of defendants to file suit or cause suit to be filed against Illinois residents on alleged credit card debts (a) where there is no signed contract, or the purported contract is subject to change by notice, and (b) the date of delinquency or last payment in defendants' records are both more than five years prior to the filing of suit.

45. On information and belief, MCM directs or causes the filing of all such lawsuits, regardless of the fact that the plaintiff is NCC or another Encore subsidiary.

46. About 1,000 cases per month are filed in the name of NCC in Cook County, Illinois alone, with more cases in other counties.

47. Other cases are filed in the name of MCM (over 1,000 during 2007 in Cook County, Illinois alone).

48. On information and belief, Encore purchases the time-barred debts, transfers them to NCC and other subsidiaries for the purpose of suit, and funds such activities.

49. All other things being equal, Encore pays less for an older debt than for a more recent debt.

50. Encore thus directly benefits from the conduct complained of herein, in that time-barred debts are cheaper than recent debts.

51. On information and belief, NCC and other Encore subsidiaries that hold title to debts have no employees, with all functions being performed by persons who are officers or employees of MCM.

52. Defendants have acted in concert to commit the violations complained of herein.

## CLASS ALLEGATIONS

53. Plaintiff brings this action on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

54. The class consists of (a) all natural persons (b) sued in the name of NCC (c) in an Illinois court (d) on an alleged credit card debt (e) where the complaint did not attach a signed contract, or attached a purported contract that is subject to change by notice, (f) where the date of delinquency or last payment in defendants' records are both more than five years prior to the filing of suit, and (g) the suit was filed on or after a date one year prior to this action, and not more than 20 days after the filing of this action.

55. The class members are so numerous that joinder is impracticable.

56. On information and belief, there are more than 50 natural persons sued in the name of NCC in an Illinois court on an alleged credit card debt, where the complaint did not attach a signed contract, or attached a purported contract that is subject to change by notice, where the date of delinquency or last payment in defendants' records are both more than five years prior to the filing of suit, and the suit was filed on or after a date one year prior to this action, and not more than 20 days after the filing of this action.

57. There are questions of law and fact common to the class members, which common questions predominate over any questions that affect only individual class members. The

predominant common questions are:

    a.    Whether defendants have a practice of filing lawsuits against Illinois residents on credit card debts that are more than 5 years old and as to which no written contract exists;

    b.    Whether such practice violates the FDCPA;

    c.    Whether such practice violates the Illinois Collection Agency Act.

58.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

59.    Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.

60.    A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible. Many debtors may not realize that their rights are violated.

## COUNT I – FDCPA

61.    Plaintiff incorporates paragraphs 1-60 by reference.

62.    It is both a deceptive practice and an unfair practice, in violation of the FDCPA, 15 U.S.C. §§1692e and 1692f, to file or threaten legal action on time-barred debts. *Kimber v. Federal Financial Corp.*, 668 F. Supp. 1480 (M.D. Ala. 1987).

63.    Defendants regularly file or cause the filing of lawsuits against Illinois residents on time-barred credit card debts.

64.    During 2007, defendants filed over 10 cases per month against Illinois residents on alleged credit card debts (a) where there is no signed contract, or the purported contract

is subject to change by notice, and (b) the date of delinquency or last payment in defendants' records are both more than five years prior to the filing of suit.

65. The Midland organization has previously been sued for engaging in this practice, and continued it with notice of its illegality. *Sadler v. Midland Credit Management, Inc., et al.*, 06 C 5045 (N.D. Ill.).

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class members and against defendants for:

    a.    Statutory damages;

    b.    Actual damages;

    c.    Attorney's fees, litigation expenses and costs of suit;

    d.    Such other or further relief as the Court deems proper.

## COUNT II – ILLINOIS COLLECTION AGENCY ACT

66. Plaintiff incorporates paragraphs 1-60 by reference.

67. This claim is against MCM only.

68. MCM is a licensee under the Illinois Collection Agency Act, 225 ILCS 425/1 et seq.

69. Defendant MCM violated the following provisions of 225 ILCS 425/9 by filing or causing the filing of time-barred lawsuits:

> **. . . (20) Attempting or threatening to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist.**

70. A private right of action exists for violation of the ICAA. *Sherman v. Field Clinic*, 74 Ill. App. 3d 21, 392 N.E.2d 154 (1st Dist. 1979).

71. Plaintiff and each member of the class was damaged as a result.

WHEREFORE, plaintiff requests that the Court grant the following relief in favor of plaintiff and the class members and against defendant MCM:

    a.    Compensatory and punitive damages;

    b.    Costs;

    c.    Such other and further relief as is appropriate.

                                      Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

## JURY DEMAND

Plaintiff demands trial by jury.

                                      Daniel A. Edelman

## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

_____
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)