# EXHIBIT B

TG

**FILED**

**FEBRUARY 4, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

WINONA JACKSON,                                  )
on behalf of plaintiff and a class,              )
                                                 )
              Plaintiff,                         )
                                                 )
       v.                                        )
                                                 )          **08 C 762**
MRC RECEIVABLES CORPORATION;                     )
MIDLAND CREDIT MANAGEMENT, INC.;                 )          **JUDGE GUZMAN**
and ENCORE CAPITAL GROUP, INC.,                  )          **MAGISTRATE JUDGE MASON**
                                                 )
              Defendants.                        )

**COMPLAINT – CLASS ACTION**

**MATTERS COMMON TO MULTIPLE CLAIMS**

**INTRODUCTION**

1.      Plaintiff Winona Jackson brings this action to secure redress against unlawful

collection practices engaged in by defendants MRC Receivables Corporation ("MRC"), Midland

Credit Management, Inc. ("MCM"); and Encore Capital Group, Inc., formerly known as MCM

Capital Group, Inc. ("Encore"). Plaintiff alleges violation of the Fair Debt Collection Practices Act,

15 U.S.C. §1692 et seq. ("FDCPA"), and state law.

2.      The FDCPA broadly prohibits unfair or unconscionable collection methods;

conduct which harasses, oppresses or abuses any debtor; and any false, deceptive or misleading

statements, in connection with the collection of a debt; it also requires debt collectors to give debtors

certain information. 15 U.S.C. §§1692d, 1692e, 1692f and 1692g.

3.      Plaintiff contends that defendants threaten and bring lawsuits against Illinois

residents on time-barred credit card debts.

**JURISDICTION AND VENUE**

4.     This Court has jurisdiction under 28 U.S.C. §§1331, 1337 and 1367 and 15 U.S.C. §1692k (FDCPA).

5.     Venue in this District is proper because defendants' collection activities took place in this District.

**PARTIES**

**Plaintiff**

6.     Plaintiff Winona Jackson resides in the Northern District of Illinois.

**MRC Receivables Corporation**

7.     Defendant MRC Receivables Corporation ("MRC") is a Delaware corporation.  Its principal place of business is 8875 Aero Drive,  Suite 200, San Diego, CA 92123. Its address for service of process is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

8.     Defendant MRC is in the business of taking title to charged-off debts allegedly owed by consumers, including large amounts of credit card debts, for a small fraction of face value and enforcing the debts against the consumers.

9.     Defendant MRC has been the plaintiff in more than 1,000 collection actions against Illinois residents.

10.     Defendant MRC is a "debt collector" as defined in the FDCPA.

11.     Defendant MRC transacts business in Illinois.

**Midland Credit Management**

12.     Defendant MCM is a Kansas corporation with its principal place of business at 8875 Aero Drive, Suite 200, San Diego, CA 92123.  MCM transacts business in Illinois.  Its

registered agent and office are Illinois Corporation Service Co., 801 Adlai Stevenson Drive, Springfield, IL 62703.

13.    Defendant MCM is a collection agency and collects the charged-off debts held in the name of MRC and other subsidiaries of Encore (described below).

14.    Defendant MCM is a "debt collector" as defined in the FDCPA.

### Encore

15.    MCM and MRC are under common ownership. Both are subsidiaries of Encore, a publicly traded Delaware corporation, with offices at 8875 Aero Drive, Suite 200, San Diego, CA 92123.

16.    Encore describes itself as "a leading accounts receivable management firm" and a "purchaser and manager of charged-off consumer receivables portfolios." (Form 8-K filed by Encore with the SEC on March 3, 2005).

17.    On March 10, 2005, Encore stated to public investors that it is a "50 year old purchaser and manager of consumer receivables portfolios." (Form 8-K filed by Encore with the SEC on March 10, 2005).

18.    Encore "acquires its receivable portfolios at deep discounts from their face values using its proprietary valuation process that is based on the consumer attributes of the underlying accounts." (Form 10-K filed by Encore with the SEC for the year ending December 31, 2006, original p. E). By "deep discount" is meant 3.0 to 3.36% of face value. (*Id.*, original p. 28).

19.    Encore states that it is responsible for developing collection strategies. Thus, on March 3, 2005, Encore stated to public investors that:

> Our fourth quarter performance capped a very strong year for Encore, as we generated record levels of collections, revenues, and earnings per share.... We were able to achieve this strong growth despite scaling back on our purchasing of new

3

portfolios throughout much of 2004 in response to less attractive pricing in the marketplace. Total purchases during 2004 were $103.4 million compared to $89.8 million in 2003. We continue to effectively develop alternative collection channels, such as legal and agency outsourcing, which increase our ability to penetrate our portfolios further....

The statement was made by Carl C. Gregory, III, then-Vice Chairman and CEO of Encore Capital Group, Inc. (Form 8-K filed by Encore with the SEC on March 3, 2005).

20.    Encore is also responsible for raising money to purchase the charged-off debts.

21.    Encore has various subsidiaries, such as MRC, take title to the debts it purchases.

22.    On March 3, 2005, Encore CEO Gregory stated in an earnings conference call:

It's notable that we achieved this strong growth despite scaling back on our purchases of new portfolios for the better part of 2004, because of a less attractive pricing environment. As we have mentioned many times, one of our competitive advantages is our varied business model that makes use of several different collection channels. During the fourth quarter we continued to see increased production out of our legal channel and our contingent agency outsourcing channel, which was developed earlier in 2004. For the full year, our collections through alternative channels, with the exception of the sales channel, more than doubled.

Turning to the purchasing market, our purchases for the first three quarters of the year were relatively modest, because of what we deemed to be a lack of opportunities that met our high standards. The market continues to be highly competitive, and it's looking like it could remain that way for quite a while. Accordingly, we have adjusted our strategy to reflect the current environment. We determined that we should not bypass profitable opportunities simply because they could not generate the high level of returns we have typically demanded, there are sufficient opportunities to purchase portfolios that can be nicely profitable for the Company. And in the current environment, it's in our best interest to acquire these portfolios rather than waiting for prices to come down.

With that being said, we invested $46.1 million in new portfolios in the fourth quarter, at an average purchase price of 3.86 percent of face value. Almost all of these purchases were credit card portfolios and that's where we found the most

4

attractive opportunities in the fourth quarter. These purchases were made with our former credit facility that expired at the end of the year. We were able to modify the terms of that credit facility during the fourth quarter, to put a ceiling on the total interest that we will have to pay on these portfolios. The lower interest expense associated with these portfolios will help offset the higher prices, and the resulting lower collection multiples and enable these portfolios to still generate nice profits for the Company.

23.     On August 3, 2004, Encore CEO Gregory stated in another earnings call:

We believe our business model is especially well-suited to this changing environment. Specifically, our business model emphasizes customer-level rather than portfolio-level analytics, innovative and flexible collection processes and conservative accounting.

The keystone to everything we do is customer-level analytics -- understanding the individual customer and his changing ability to pay. Prior to purchase and throughout our ownership, we analyze the individual customer's ability and willingness to pay. We are always asking the same question -- can this particular customer pay us all or some of what he owes now? By focusing on the customer and information about him, we are able to move comfortably across various asset types as well as the portfolio ages or time since charge-off. In this process, a score is generated for every single account we own and the score is refreshed quarterly to ensure that it maintains its accuracy.

The second major aspect of our business model is our use of innovative collection strategies that are driven by the underlying collectibility score of each customer. In other words, to fully benefit from the new information we are generating about the individual customers, we have to be able to apply different collection strategies as appropriate, or at least be able to apply the traditional approaches in new ways that will be more effective.

We now have eight unique revenue channels that each contribute more than $1 million per month in collections, including direct mail, balance transfer, external legal, and our recently developed agency outsourcing strategy.

24.     Encore's involvement in the collection process is such as to make it a "debt collector" as defined in the FDCPA.

25.     All of the defendants herein are under common control as well as ownership, with common or overlapping officers and directors. For example, J. Brandon Black is president and

5

CEO of MCM, CEO of Encore, and president of MRC.

## FACTS RELATING TO PLAINTIFF JACKSON

26.     On or about November 28, 2007, suit was filed in the name of MRC against plaintiff Jackson in the Circuit Court of Cook County, case 07 M1 218190, seeking to collect a supposed credit card debt incurred for personal, family or household purposes.

27.     Attached to the complaint was a purported affidavit ("Form 409") from an employee of MCM, "servicer of this account on behalf of MRC Receivables Corp."

28.     On information and belief, MCM directed or caused the filing of the lawsuit.

29.     The complaint did not have attached to it any contract signed by the putative debtor.

30.     The complaint did have attached to it a supposed unsigned "cardmember agreement" which stated that "we may change the terms of this Agreement from time to time" by notice, without a signature being required.

31.     The "cardmember agreement" stated that it was governed by Delaware law. Delaware law authorizes a credit card issuer to change the terms from time to time by notice, without a signature being required, unless a cardmember agreement disclaims this right. 5 Del. C. §952.

32.     The complaint and attached documents are attached hereto as Appendix A.

33.     The "Form 409" affidavit gave a delinquency date, which was more than five years prior to the filing of the action.

34.     Defendants maintain computerized records of payments on purchased accounts.

35.     The computerized records relating to the account that was the subject of

6

<u>Appendix A</u> did not show any payment within five years prior to the filing of the action.

    36.    Plaintiff Jackson appeared and defended the action.

    37.    On January 17, 2008, MRC nonsuited it.

<b><u>FACTS – GENERAL</u></b>

    38.    The alleged debt that was the subject of <u>Appendix A</u> was no longer enforceable through legal action as a result of the expiration of the five-year statute of limitations, 735 ILCS 5/13-205. *Parkis v. Arrow Financial Services*, 07 C 410, 2008 U.S. Dist. LEXIS 1212 (N.D. Ill., Jan. 8, 2008); *Weniger v. Arrow Financial Services*, 03 C 6213, 2004 U.S. Dist. LEXIS 23172 (N.D. Ill., Nov. 18, 2004); *Nicolai v. Mason*, 118 Ill. App. 3d 300; 454 N.E.2d 1049 (5th Dist. 1983).

    39.    It is the policy and practice of defendants to file suit or cause suit to be filed against Illinois residents on alleged credit card debts where the date of delinquency and the date of last payment, according to defendants' records, are both more than five years prior to filing.

    40.    It is the policy and practice of defendants to file suit or cause suit to be filed against Illinois residents on alleged credit card debts where the complaint does not have attached to it a written contract bearing the signature of the putative debtor. On information and belief, based on examination of multiple files, in no or virtually no case do defendants attach a signed contract.

    41.    It is the policy and practice of defendants to file suit or cause suit to be filed against Illinois residents on alleged credit card debts where the contract terms may be altered by notice without a signature by the putative debtor.

    42.    Under Illinois law, if a complaint does not have a signed contract attached to it, it is presumptively subject to the five-year statute of limitations for contracts not wholly in writing. *Barnes v. Peoples Gas Light & Coke Co.*, 103 Ill.App.2d 425, 428, 243 N.E.2d 855 (1st

7

Dist. 1968); *O.K. Electric Co. v. Fernandes*, 111 Ill.App.3d 466, 444 N.E.2d 264, 266-67 (2nd Dist.

1982).

43.     Under Illinois law, if a purported contract may be altered by notice without

a signature, with either failure to object or continued dealings constituting acceptance of the new

terms, it is subject to the five-year statute of limitations for contracts not wholly in writing. *Toth*

*v. Mansell*, 207 Ill. App. 3d 665, 669, 566 N.E.2d 730, 733 (1st Dist. 1990); *Classified Ventures,*

*Inc. v. Wrenchead, Inc.*, 06 C 2373, 2006 U.S. Dist. LEXIS 77359 (N.D. Ill., Oct. 11, 2006).

44.     Notwithstanding this, it is the policy and practice of defendants to file suit or

cause suit to be filed against Illinois residents on alleged credit card debts (a) where there is no

signed contract, or the purported contract is subject to change by notice, and (b) the date of

delinquency or last payment in defendants' records are both more than five years prior to the filing

of suit.

45.     On information and belief, MCM directs or causes the filing of all such

lawsuits, regardless of the fact that the plaintiff is MRC or another Encore subsidiary.

46.     About 150 cases per month are filed in the name of MRC in Cook County,

Illinois alone, with more cases in other counties.

47.     Other cases are filed in the name of MCM (over 1,000 during 2007 in Cook

County, Illinois alone).

48.     On information and belief, Encore purchases the time-barred debts, transfers

them to MRC and other subsidiaries for the purpose of suit, and funds such activities.

49.     All other things being equal, Encore pays less for an older debt than for a

more recent debt.

50.     Encore thus directly benefits from the conduct complained of herein, in that

8

time-barred debts are cheaper than recent debts.

51.     On information and belief, MRC and other Encore subsidiaries that hold title to debts have no employees, with all functions being performed by persons who are officers or employees of MCM.

52.     Defendants have acted in concert to commit the violations complained of herein.

## CLASS ALLEGATIONS

53.     Plaintiff brings this action on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

54.     The class consists of (a) all natural persons (b) sued in the name of MRC (c) in an Illinois court (d) on an alleged credit card debt (e) where the complaint did not attach a signed contract, or attached a purported contract that is subject to change by notice, (f) where the date of delinquency or last payment in defendants' records are both more than five years prior to the filing of suit, and (g) the suit was filed on or after a date one year prior to this action, and not more than 20 days after the filing of this action.

55.     The class members are so numerous that joinder is impracticable.

56.     On information and belief, there are more than 50 natural persons sued in the name of MRC in an Illinois court on an alleged credit card debt, where the complaint did not attach a signed contract, or attached a purported contract that is subject to change by notice, where the date of delinquency or last payment in defendants' records are both more than five years prior to the filing of suit, and the suit was filed on or after a date one year prior to this action, and not more than 20 days after the filing of this action.

57.     There are questions of law and fact common to the class members, which

9

common questions predominate over any questions that affect only individual class members. The predominant common questions are:

       a.      Whether defendants have a practice of filing lawsuits against Illinois residents on credit card debts that are more than 5 years old and as to which no written contract exists.

       b.      Whether such practice violates the FDCPA.

       c.      Whether such practice violates the Illinois Collection Agency Act.

58.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

59.    Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.

60.    A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible. Many debtors may not realize that their rights are violated.

## COUNT I – FDCPA

61.    Plaintiff incorporates paragraphs 1-60 by reference.

62.    It is both a deceptive practice and an unfair practice, in violation of the FDCPA, 15 U.S.C. §§1692e and 1692f, to file or threaten legal action on time-barred debts. *Kimber v. Federal Financial Corp.*, 668 F. Supp. 1480 (M.D. Ala. 1987).

63.    Defendants regularly file or cause the filing of lawsuits against Illinois residents on time-barred credit card debts.

64.    During 2007, defendants filed over 10 cases per month against Illinois

residents on alleged credit card debts (a) where there is no signed contract, or the purported contract is subject to change by notice, and (b) the date of delinquency or last payment in defendants' records are both more than five years prior to the filing of suit.

65.    The Midland organization has previously been sued for engaging in this practice, and continued it with notice of its illegality. *Sadler v. Midland Credit Management, Inc., et al.*, 06 C 5045 (N.D. Ill.).

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class members and against defendants for:

     a.    Statutory damages;

     b.    Actual damages;

     c.    Attorney's fees, litigation expenses and costs of suit;

     d.    Such other or further relief as the Court deems proper.

## COUNT II – ILLINOIS COLLECTION AGENCY ACT

66.    Plaintiff incorporate paragraphs 1-60 by reference.

67.    This claim is against MCM only.

68.    MCM is a licensee under the Illinois Collection Agency Act, 225 ILCS 425/1 et seq.

69.    Defendant MCM violated the following provisions of 225 ILCS 425/9 by filing or causing the filing of time-barred lawsuits:

**. . . (20) Attempting or threatening to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist.**

70.    A private right of action exists for violation of the ICAA. *Sherman v. Field Clinic*, 74 Ill. App. 3d 21, 392 N.E.2d 154 (1st Dist. 1979).

11

71.     Plaintiff and each member of the class was damaged as a result.

WHEREFORE, plaintiff requests that the Court grant the following relief in favor of plaintiff and the class members and against defendant MCM:

        a.      Compensatory and punitive damages;

        b.      Costs;

        c.      Such other and further relief as is appropriate.

                                              Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

**<u>JURY DEMAND</u>**

Plaintiff demands trial by jury.

                                              Daniel A. Edelman

## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

_____
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

13

08 C 762

**JUDGE GUZMAN**
**MAGISTRATE JUDGE MASON**

# APPENDIX A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT, FIRST DISTRICT

MRC Receivables Corp.                    ) Case No.
S/I/I TO ASSOCIATES                      ) Contract
                                         )                    07 M1  218190
                                         )
            Plaintiff,                   )
                                         ) Amount Claimed $2,419.35
vs.                                      ) + attorney fees, interest and costs
                                         )
WINONA JACKSON                           ) Return Date:  JAN 03 2008
                                         )
                                         )
            Defendant(s)                 )

## VERIFIED COMPLAINT AT LAW

NOW COMES the Plaintiff, MRC Receivables Corp. S/I/I TO ASSOCIATES, by and through its attorneys, ADLER & ASSOCIATES, LTD., and for its complaint against the Defendant(s), WINONA JACKSON, alleges and states as follows:

1. At the specific instance and request of the Defendant(s) WINONA JACKSON, MRC Receivables Corp. S/I/I TO ASSOCIATES issued to Defendant(s) a certain charge card account.

2. Defendant(s) made various charges to said account since the date of issuance and, after accounting for any payments made, there remains an unpaid and past due balance in the sum $1,940.37, as set forth in Exhibit "A."

3. Demand for payment has been made upon Defendant(s) but Defendant(s) has/have failed or refused to pay said remaining balance.

4. Plaintiff claims reasonable attorneys' fees in the sum of $350.00, as provided for in the cardmember agreement, if attached, together with accruing interest, pursuant to the same agreement, at the rate of 5%, until the date of judgment. Accrued interest as of September 10, 2007 is $478.98.

WHEREFORE, Plaintiff, MRC Receivables Corp. S/I/I TO ASSOCIATES, prays judgment be entered in its favor and against the Defendant(s), WINONA JACKSON, in the amount of $2,419.35, plus attorney fees of $350.00, or whatever amount the court awards, together with accrued interest from September 10, 2007 to the entry of judgment, and costs.

                                    ADLER & ASSOCIATES, LTD.

                                    BY: _____
                                              For the Firm

ADLER & ASSOCIATES, LTD., #00512
ATTORNEYS FOR PLAINTIFF
25 E. WASHINGTON, #500
CHICAGO, IL  60602
312 726-1814
T07129

Form 409 (Illinois & Indiana)

State of_____)
                        ) ss.
County of _____)

In _____Court

_____Judicial (Circuit/District)

MRC Receivables Corp.,
                    Plaintiff

Vs.                                          Affidavit

WINONA JACKSON,
                    Defendant

After first being sworn upon oath, Monica Sharp, deposes and states as follows:

1. I am employed by Midland Credit Management, Inc., servicer of this account on behalf of MRC Receivables Corp.. I make the statements herein based upon my personal knowledge. MRC Receivables Corp. is the current owner of, and/or successor to, the obligation sued upon.

2. That by virtue of such relationship and my employment with Midland Credit Management, Inc., I have personal knowledge of relevant financial information concerning Midland Credit Management, Inc.'s account number 8509270838, which includes the following information: that the defendant did fail to make payments on the account and that demand has been made for defendant to make payment of the balance owing on the account described above more than thirty(30) days prior to making this affidavit; that the attorneys representing plaintiff MRC Receivables Corp. were retained on MRC Receivables Corp. behalf by me or persons reporting to me for the purpose of collecting the delinquent debt owed on the defendant's account number set out above; and that there was due and owing to MRC Receivables Corp. the sum of $1,940.37.

3. That plaintiff's predecessor in interest sold and assigned all right, title and interest in the defendant's ASSOCIATES account number, 4223980229496316, to the plaintiff.

4. That the final statement of account reveals that the defendant owed a balance of $2,389.84 on 10/4/2002; and that such balance will continue to earn interest at a rate of 5% as an annual percentage rate calculated as required by the Federal Truth In Lending Act, until judgment is entered herein, after which interest on the unpaid balance shall accrue as required by law and as set forth within the terms of the judgment. I affirm that the final statement of account is true and correct.

Form 409 (Illinois & Indiana)

**5. That by virtue of the foregoing,** the defendant is delinquent in payments due and owing on the account, allowing plaintiff to accelerate the entire balance as due and owing.  That plaintiff has made demand of defendant to make payments on the account, and that plaintiff has made demand for the entire balance due and owing, but defendant has, in all things, failed or refused to make payments as demanded by plaintiff.

Dated this 7 day of June, 2007.

Monica Sharp

_____
Affiant's Signature

State of Minnesota
County of Stearns
Subscribed and sworn to (or affirmed) before me on this 07 day of June 2007
by Monica Sharp personally known to me or proved to me on the basis of satisfactory evidence to be the person(s)
who appeared before me.
(SEAL)

KRISTEN L. GEORGE
Notary Public-Minnesota
My Commission Expires Jan. 31, 2011

_____
Notary Public for the State of Minnesota

Arthur B. Adler & Associates, Ltd.

## ASSOCIATES NATIONAL BANK (DELAWARE) MASTERCARD* OR VISA* ACCOUNT CARDMEMBER AGREEMENT

**Definitions.** In this Agreement "you" and "your" refer to Cardmember (if the Account is a joint account, "you" and "your" refer to both Cardmembers); "we", "us", and "our" refer to Associates National Bank (Delaware); "Card" means the MasterCard or Visa card or cards issued by us to you; "Account" means the MasterCard or Visa account issued by us to you; "ATMs" means automated teller machines.

**Scope of Agreement.** This Agreement and the Pricing and Fee Disclosure govern your Account and use of the Card we have issued to you. If the Account is a joint account, each of you will be bound by this Agreement and each of you will be jointly and individually responsible for repaying all amounts due under this Agreement. We will pay MasterCard or Visa member merchants for goods and services you obtain by use of this Account, and we may make other loans (cash advances) to you on terms explained in this Agreement.

**Acceptance of Agreement.** The use of your Account or Card(s) by you or anyone who you authorize or permit to use your Account or Card(s) means you accept this Agreement.

**Means to Access Account.** You may obtain a loan from Associates National Bank (Delaware) under your Account with your Card or a convenience check as follows: by purchasing goods or services with your Card or your Account number; by obtaining a cash advance from a financial institution including us, an ATM, by use of a convenience check or, by incurring charges authorized by this Agreement. We are not responsible for any merchant's or other institution's refusal to honor the Card or convenience check;

**Credit Limits.** We will advise you of the credit limit on your Account. A portion of your credit limit, called the cash advance limit, will be available for cash advances. We may increase or decrease the credit limit or cash advance limit at any time. The cash advance limit will be shown on your monthly statement.

**Convenience Checks.** Upon request and from time to time, we may send you convenience checks for use in borrowing under this Agreement. All convenience checks you use will be treated as cash advances under this Agreement unless we advise you otherwise. You may not use the convenience checks to make payments on any Associates National Bank (Delaware) account or an account with any of our affiliates. You understand that if you use a convenience check to make a purchase and you have a dispute with that purchase, the dispute is not covered by the Billing Rights Summary below. You understand that the convenience checks will not be returned to you.

**ATMs.** You may use the Card to obtain cash advances through certain ATMs. You will be given a Personal Identification Number (PIN) which must be used in order to obtain an ATM cash advance. Some limitations on ATM cash advances may apply, such as limitations on dollar amount, number, or currency denominations. You agree that charges imposed by third parties for use of their

ATM facilities will be added to your Account balance as a cash advance.

**Purchases Treated as Cash Advances.** We consider certain transactions to be the equivalent of cash advances, and we reserve the right to treat them as cash advances under this Agreement. Those transactions include using the Card or Account to purchase wire transfer money orders, money orders that are not issued by a financial institution or are not in U.S. currency, travelers checks, casino gaming chips, lottery tickets, off-track betting, wagers at race tracks, and tax payments.

**Additional Cardholders, Authorized Users, and Others using your Account.** You may authorize others to use your Account. At your request, we may issue additional Cards to you. One additional Card may be issued with the individual name of an authorized user embossed. All other additional Cards must be issued in your name. You promise to pay for all purchases and cash advances made by anyone you authorize to use your Account with or without a Card, whether or not you notify us that he or she will be using the Account and whether or not he or she exceeds any limits imposed by you on his or her use of the Card. If another person has use of your Account and you want to end that person's privilege, you must notify us in writing to us, by calling us, or in person. In order to avoid unauthorized use, you should recover any cards in that person's possession.

**Foreign Exchange.** If you make a purchase or an advance in foreign currency, it will be converted by Visa International or MasterCard International into U.S. dollars. Visa International will use the procedures set forth in its Operating Regulations in effect at the time the transaction is processed. Currently, those regulations provide that the currency conversion rate to be used is either a wholesale market rate or a government-mandated rate in effect one (1) day prior to the processing date, increased by 1%. MasterCard International, will use the Conversion Procedures published from time to time in instruments and effective at the time the transaction is processed. Currently, these Conversion Procedures provide that the currency conversion rate to be used is either a wholesale market rate or a government-mandated rate, increased by 1%. In either case, the currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or the posting date. The currency conversion rate used may be the same as, greater than or less than the amount that would be calculated by conversion through a financial institution in the country in which the purchase or advance occurred. We do not determine the currency conversion rate which is used and we do not receive any portion of the currency conversion rate.

**Default.** You will be in default if you fail to make any payment when due, exceed your credit limit, die, become a subject of bankruptcy or insolvency proceedings, do not comply with any of the terms of this Agreement, or if you provided false information to obtain this Account. If you are in default, we may declare all amounts you owe to be immediately due and payable. Also, we may prohibit any further transaction on your Account, cancel the Card and revoke any privileges attaching to the Cards. You agree to surrender all Cards to us or our designee upon demand. If you

default, we, at our option, may refuse to pay any of your convenience checks that are presented to us. If we decide to honor such checks, you will owe us the amount of such checks under the terms of this Agreement. If, after default, we refer your Account for collection to a collection agency or to an attorney who is not our salaried employee, we agree that, when and as permitted by applicable law, we may charge and collect from you our collection costs, including without limitation, court costs and reasonable attorneys' fees.

**Collection.** You agree that if you do not pay your Account, you will accept calls from us regarding the collection of the Account. You understand that the calls could be automatically dialed and a recorded message may be played. You agree that such calls will not be unsolicited calls for purposes of state or federal law.

**Billing Statement Disputes.** You agree to accept the monthly statements that we mail you as being correct unless you notify us in writing of alleged errors within the time prescribed by law. Your rights to dispute billing errors are set forth following this Agreement. If you have notified us that an amount is in dispute in accordance with the procedures that follow this Agreement, you need not pay that amount until the dispute is resolved. However, you must pay at least the required Minimum Payment Due.

**Modifications.** Subject to applicable law, we may change the terms of this Agreement from time to time. We have the right to apply the new terms to the outstanding balance of your Account as of the effective date of the change. If we make a change, we will give you notice as required by applicable law.

**Exceeding Credit Limit.** You will not use or permit use of any Card or convenience check for any purchase or cash advance which would cause your credit limit to be exceeded. Without limiting any of our rights under the section of this Agreement entitled "Default", if the Account balance exceeds the credit limit at any time, you will immediately pay us the excess upon demand.

**Use of the Card.** We are not responsible if anyone refuses to honor this Card or any convenience check or for any failure of an ATM to process cash advance request. If there is a problem with merchandise or services obtained with this Card, you may have the right not to pay the remaining amount due on such merchandise or services. This right does not, however, apply to merchandise or services obtained with convenience checks or with money from a cash advance. Following this Agreement is an explanation of your rights to dispute billing errors. We will have no responsibility for merchandise or services purchased with this Card.

**Expiration; Renewal; and Termination.** Cards are issued with an expiration date. We have the right not to renew your Account. Without limiting our rights provided in the section of this Agreement entitled "Default", we have the right to revoke the privilege attaching to any or all Cards, cancel the Cards and terminate this Agreement as to future purchases or cash advances at any time for any reason. Upon termination you agree to immediately surrender all Cards (which you will cut in half) and unused convenience checks to us.

**Obligation for Repayment.** Even though the Card or your right to use convenience checks is revoked or terminated, you agree that your obligations and our rights under this Agreement will remain in effect until all balances on your Account incurred before or after revocation or termination are paid in full.

**Assignment.** Your rights under this Agreement cannot be transferred by you or operation of law or otherwise, but your obligations shall be binding upon your estate or personal representatives. We may assign this Agreement or any of our rights under it without prior notice of your consent.

**Signature.** You agree to sign (and, if appropriate, have authorized users sign) in the space provided for authorized signatures on the Card before the Card is used. Your signature or the signature of authorized users on the Card, on any convenience check or on any charge slip intended for this Account, or any use of the Card by you or any authorized user, is your agreement to comply with the terms of this Agreement.

**Governing Law.** This Agreement is governed by Delaware law, subject to applicable provisions of Federal law.

**No Waiver of Rights.** We can delay enforcing our rights under this Agreement without losing them. We can accept late payments, partial payments or checks and money orders marked as being payment in full without losing any rights under this Agreement.

**Telephone Monitoring.** As part of our continuing effort to maintain a high quality of service to our customers, telephone calls between our employees and our customers are periodically monitored on a random basis, by our supervisory personnel. You understand this and give your consent to any such monitoring as to any telephone calls you may have with us.

**Notices; Addresses.** Notices to us shall be effective when received by us at the address indicated for receipt of payments on any billing statement, mailed to you within the preceding 60 days. Notices to you, if mailed, shall be deemed given when mailed to you at the address given on the application of authorization form or to such other address you have given us by notice. You agree to provide us with a notice of any change of your address at least 10 days prior to the change.

**Other Services.** You understand that from time to time third parties may offer additional Account features, services, and enhancements. You understand that we are not liable for these features, services, and enhancements and they are the sole responsibility of third parties. You will hold us harmless from any claims, actions, or damages resulting from your use of any of these features, enhancements, or services when permitted by applicable law.

**Unauthorized Use, Loss or Theft of Card.** You may be liable for the unauthorized use of the Card. You will not be liable for unauthorized use that occurs after you notify us, orally or in writing, of the loss, theft, or possible unauthorized use. In any case, your liability for unauthorized use will not exceed $50. You may telephone us to report the loss, theft, or possible unauthorized use of the Card.

**Information Sharing.** You agree that we may release information in our records regarding you and your Account in order to comply with any properly served subpoena or similar request issued by any state or federal agency or court; to share our credit experiences on your account with credit reporting agencies and other creditors who we reasonably believe are doing business with you; to provide information about you and your account to any of our subsidiaries or affiliates to provide our customer lists (which may include information about you and your Account) to third parties; and, to provide Account information to any third party who we reasonably believe is conducting an inquiry in accordance with the Federal Fair Credit Reporting Act. (See Message to Cardmembers Concerning Privacy)

**Credit Reports.** We may investigate your credit record from time to time in connection with your application and any resulting Account or update, renewal, or extension of the Account. Upon your request, we will advise you if we obtained a credit report and we will give you the credit bureau's name and address. You understand that a negative credit report reflected on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations under this Agreement. If you believe information related to this extension of the credit in your credit report is inaccurate, you may notify us of the same by writing to us at Associates National Bank, P. O. Box 15686, Wilmington, DE 19850-5686.

**Severability.** If any clause of this Agreement is in conflict with applicable law, that clause will be considered to be modified to conform with that applicable law.

**Daily Balance Calculation.** To get the Daily Balance for purchases and cash advances for each day, we take the beginning balance of your Account each day, including accrued but unpaid Finance Charges and other fees through the previous day, add any new purchases (including amounts advanced for insurance) (to the Daily Balance for purchases), each advances (to the Daily Balance for cash advances), or debit adjustments, and subtract any payments, credits, or credit adjustments. Purchases and cash advances are included in the Daily Balance as of the later of the date of the transaction or the first day of the billing cycle in which the purchase or cash advance is entered on your Account. However, if you pay the New Balance shown on your previous billing statement in full on or before the Due Date shown on the billing statement, new purchases will not be included in the Daily Balance for purchases.

**Payments.** You agree to pay us any amounts borrowed under this Agreement by you or an authorized user. Each month that there is an outstanding balance of $2.00 or more on your Account, on a date we select, we will send you a monthly statement as of the closing date of your billing cycle. Purchases, cash advances, payments and adjustments made since the closing date on your previous statement will appear on your billing statement. You must pay at least the Minimum Payment Due by the Due Date shown on the statement. The Minimum Payment Due is stated on your Pricing and Fee Disclosure.

Any past due amounts you owe and any amounts that exceed your credit limit may be included in the Minimum Payment Due.

Payments shall be made by check or money order in U.S. currency denominations. If you pay by check, the check must be drawn on funds in the U.S. Payments must be sent to our payment address shown on the billing statement. Payments received by 2:00 p.m. will be credited to your Account on the date received. Payments received after 2:00 p.m. will be credited to your Account on the next business day.

**Application of Payments.** Each payment you send us will be applied to your Account in a manner that we determine. We reserve the right to apply payments to balances subject to lower Annual Percentage Rates, including, but not limited to, special rate balance transfers, prior to balances subject to higher Annual Percentage Rates.

**ARBITRATION. THIS ARBITRATION PROVISION LIMITS YOUR RIGHT TO LITIGATE CLAIMS IN COURT AND YOUR RIGHT TO A JURY TRIAL. YOU SHOULD READ THIS PROVISION CAREFULLY.** Any claim, dispute, or controversy (a "Dispute") between you and us including without limitation those related to this Cardmember Agreement, your Account, goods or services purchased in whole or part by use of your Account, or those relating to the validity, enforceability, or scope of this arbitration provision shall be resolved, upon the election of you or us, by binding arbitration pursuant to this arbitration provision and the Commercial Arbitration Rules and Procedures of the American Arbitration Association (AAA). This arbitration provision also applies to any Dispute between you and any of our employees, our affiliate companies, and any of their employees. This arbitration provision is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. §1-16. The arbitrator shall apply applicable substantive law consistent with the Federal Arbitration Act and applicable statutes of limitations and shall honor all claims of privilege recognized at law. This arbitration provision is fully binding in the event a class action is filed in which you bring an action as a class representative or member. You and we agree that arbitration pursuant to this arbitration provision which involve you and us and/or any other person cannot be consolidated. You and we further agree that there shall be no class action arbitration pursuant to this arbitration provision. This arbitration provision shall survive the inactivation or termination of this Cardmember Agreement or your Account. If any portion of this arbitration provision is deemed invalid or unenforceable, the remaining portions are severable and enforceable to the fullest extent permitted by law. This arbitration provision supersedes any prior arbitration provision that there may be between you and us.

**Small Claims Exception:** If a Dispute arises between you and us and either you or we bring an action as a result in a small claims court or a similar court with a jurisdictional limit of $5,000 or less, the other party may NOT demand arbitration of that Dispute pursuant to this arbitration provision. If at any time during such an action, the case is transferred to a court with a jurisdictional limit in excess of $5,000, then you or we may demand arbitration of the

entire Dispute, pursuant to this provision, at any time after that court assumes jurisdiction of the Dispute.

**To Start Arbitration:** Either you or we can start arbitration any time a Dispute arises between you and us. To start arbitration, you or we must contact the AAA at:

    American Arbitration Association
    13455 Noel Road
    Two Galleria Tower, Suite 1750
    Dallas, TX 75240-6636

For more information about the arbitration process, or to obtain a copy of the Commercial Arbitration Rules and Procedures, contact the AAA at 1-800-426-8792, or log on to their web site at http://www.adr.org.

**No Waiver:** You and we agree that bringing a lawsuit, counterclaim, or other action in court shall not be deemed a waiver of the right to demand arbitration of any Dispute brought by the other party. As an example, and not by way of limitation, if we file a lawsuit against you in court to collect a debt, and you file a counterclaim against us in that lawsuit, we have the right to demand that the entire Dispute, including our original lawsuit against you and your counterclaim against us, be arbitrated in accordance with this arbitration provision. You and we agree that bringing the lawsuit shall not operate as a waiver of our right to demand arbitration.

**Cost of Arbitration:** If you start arbitration, you agree to pay the initial filing fee and deposit required by the AAA. If we start arbitration, we will pay the filing fee and deposit. If you believe you are financially unable to pay such fees you may ask the AAA to defer or reduce such fees, pursuant to the Commercial Arbitration Rules and Procedures. If the AAA does not defer or reduce such fees so that you are able to afford them, we will, upon your written request, pay the fees, subject to any later allocation of the fees and expenses between you and us by the arbitrator. There may be other costs during the arbitration, such as attorney's fees, expenses of travel to the arbitration, and the costs of the arbitration hearings. The Commercial Arbitration Rules and Procedures determine who will pay those fees.

**Location of Arbitration:** Any arbitration hearing will take place in the federal judicial district in which you live unless you and we both agree to another location.

**Enforcement of Arbitration:** After the arbitrator has made a decision, either you or we may take any legal action, including filing a lawsuit, to enforce the arbitrator's decision in any federal or state court that has jurisdiction.

**YOUR BILLING RIGHTS. KEEP THIS NOTICE FOR FUTURE USE.**

This Notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case Of Errors Or Questions About Your Bill.** If you think your bill is wrong, or if you need more information about a transaction on your bill, write to us on a separate sheet at:

Associates Credit Card Services, Inc., Attn: Customer Research Dept.
P. O. Box 142319, Irving, TX 75014-2319

Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information: Your name and account number, the dollar amount of the suspected error, describe the error and explain, if you can, why you believe there is an error; if you need more information, describe the item you are not sure about.

If you have authorized us to pay your credit card bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

*Your Rights And Our Responsibilities After We Receive Your Written Notice*

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

*Special Rule for Credit Card Purchases*
If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to

correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a)    You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address and,

(b)    The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

## MESSAGE TO CARDMEMBERS
## CONCERNING PRIVACY

To understand and serve our customers' needs, we share customer information (including credit information) with other members of The Associates family. In addition, Associates National Bank (Delaware) may also enter into arrangements to share information with unrelated businesses to determine your eligibility and to deliver offers that may be of interest or provide value to our customers.

You may elect to not allow us to share information with our affiliates or other businesses by "opting-out" of the information sharing. Your options are one or both of the options as follow:

Option 1 - We will not share information about you with any non-affiliate party.

Option 2 - We will not share information about you with our affiliates.

We respect your privacy. If you'd prefer that we not share your information, simply write to us at the address provided below. To ensure that your request can be processed, please include your name, address, telephone number, social security number and account number for any Associates credit card account for which you wish the information to remain private. Specify one or both of the above options in your correspondence. Please allow us time to process your request.

Associates National Bank (Delaware)
P. O. Box 15686
Wilmington, DE 19850-5686

This Cardmember Agreement, as well as the Pricing and Fee Disclosure, govern your Account and use of the card we have issued to you.