# EXHIBIT 6

Westlaw.

Slip Copy                                                                                                                               Page 1
Slip Copy, 2008 WL 413749 (N.D.Cal.), 13 Wage & Hour Cas.2d (BNA) 680

**H**In re Wal-Mart Stores, Inc. Wage and Hour Litigation
N.D.Cal.,2008.

United States District Court,N.D. California.
In re WAL-MART STORES, INC. WAGE AND HOUR LITIGATION.
This Document Relates To: Case Nos. C 06-02069 SBA (Smith) and C 06-05411 SBA (Ballard).
**No. C 06-2069 SBA.**
**Docket Nos. 149, 244.**

Feb. 13, 2008.

Bonnie Rae Mac Farlane, Bailey Pinney PC, Sacramento, CA, Louis Michael Marlin, Stanley Donald Saltzman, Marlin & Saltzman, Irvine, CA, Arnold William Schwartz, Marcus Joseph Bradley, Schwartz Daniels & Bradley Adley, Agoura Hills, CA, Jose Ruben Mata, Bailey Pinney PC, Vancouver, WA, Peter M. Hart, Peter M. Hart Law Offices, Marina Del Rey, CA, Susan Simmons Seemiller, Bailey Pinney PC, Ventura, CA, for Plaintiff.
Renee T. Lawson, Candice Simone Crookshank, Eric Meckley, Joan M. Haratani, Kent Michael Roger, Rebecca Dianne Eisen, William James Taylor, Morgan Lewis & Bockius LLP, San Francisco, CA, Rudy A. Englund, Lane Powell PC, Seattle, WA, for Defendant.

**ORDER**

SAUNDRA BROWN ARMSTRONG, District Judge.

***1** This matter comes before the Court on plaintiffs Barry Smith, Michael Wiggins, Denton Ballard and Nathan Lyons' Motion for Class Certification [Docket No. 149] and defendant Wal-Mart, Inc.'s Motion to Strike or in the Alternative for Leave to File a Surreply [Docket No 224]. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing.

For the reasons articulated below, the Court hereby GRANTS IN PART and DENIES IN PART the Motion for Class Certification. Defendants' Motion to Strike is DENIED, however the Motion for Leave to File a Surreply is GRANTED.

**BACKGROUND**

**I. Procedural Background**

Plaintiffs Smith, Wiggins, Ballard and Lyons are all former Wal-Mart employees who were terminated by Wal-Mart and who claim that they either did not receive all of their final pay or were paid their final pay late in violation of the California Labor Code. On March 20, 2006, plaintiffs Smith and Wiggins filed their complaint in this Court. On May 17, 2006, plaintiffs Ballard and Lyons filed their similar action in the Superior Court of California, Los Angeles County. Wal-Mart removed the Ballard/Lyons action, and that matter was transferred and consolidated with the Smith/Wiggins action before this Court. On March 27, 2007, plaintiffs filed their First Amended Consolidated Complaint. Wal-Mart filed a motion to dismiss, which was denied in part and granted in part. In its May 29, 2007 order on the motion to dismiss, the Court noted that the plaintiff's proposed class definitions were "suspicious" and "may in fact be improper" as merits-based and lacking ascertainability. Nonetheless, the Court allowed plaintiffs to conduct appropriate discovery in order to make the case for certification.

The First Amended Consolidated Complaint seeks to recover for Wal-Mart's alleged violation of California Labor Code § 201 (failure to timely pay all earned wages upon termination), Labor Code § 227.3 (failure to pay accrued vacation upon termination), and restitution pursuant to California Business & Professions Code § 17200, based upon the Labor Code Violations.[FN1]

> [FN1]. Other claims alleged in the First Amended Consolidated Complaint were dismissed as a result of either the motion to dismiss or by stipulation.

On October 9, 2007, plaintiffs filed the instant Motion for Class Certification. Plaintiffs seek certification of the following class:[FN2]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

> FN2. The proposed subclass definitions plaintiffs offer here differ somewhat from the "suspicious" class definitions offered by plaintiffs at the time the Court resolved the motion to dismiss.

All former California employees of defendant Wal-Mart Stores, Inc. whose employment ended during the period from March 20, 2002 through and including the date a judgment is rendered in this matter and who, based upon Wal-Mart's computerized records, are members of one of the following Subclasses:

> *Subclass No. 1:* Class members who, according to Wal-Mart's computerized records, have not been paid all accrued and unused vacation and personal time they earned while employed by defendant.

> *Subclass No. 2:* Class members who, according to Wal-Mart's computerized records, have not been paid all wages (except accrued and unused vacation and personal time) they earned while employed by defendant.

> **\*2** *Subclass No. 3:* Class members who, according to Wal-Mart's computerized records, although ultimately having been paid all wages they earned while employed by defendant, either (1) were discharged and did not have all wages that Wal-Mart's records reflect were earned and unpaid made available to them immediately at the time of discharge, or (2) quit and gave defendant 72 hours of notice of his or her intention to quit and did not have all wages that Wal-Mart's records reflect were earned and unpaid made available to them at the time of quitting, or (3) quit and gave less than 72 hours notice and who did not have all wages that Wal-Mart's records reflect were earned and unpaid made available to them within 72 hours of giving notice.

As used in this proposed Class Definition, the term "wages" includes vacation pay, personal time pay, hourly pay, salary and geographical assistance pay (GAP).

Plaintiffs seek certification of the following claims on behalf of the class:

1. The First Cause of Action for Statutory Wage Violation of California Labor Code §§ 201-203 (late payment of wages and penalty) on behalf of the entire Class;

2. The Second Cause of Action for Statutory Violation of California Labor Code § 227.3 (vested vacation wages) on behalf of Subclass No. 1; and

3. The Sixth Cause of Action for Unfair Business Practices in Violation of California Business & Professions Code §§ 17200, et.seq. on behalf of the entire Class.FN3

> FN3. In their initial brief, plaintiffs mysteriously included a claim for "breach of contract"-which does not exist in the amended complaint-as one of the claims they seek certification for. However, plaintiffs omit any discussion of this claim in their reply and appear to no longer assert it.

**II. Factual Background**

**A. Wal-Mart's Employee Compensation System**

Wal-Mart operates more than 200 Wal-Mart stores and Sam's Clubs in California. Each store employs hundreds of non-exempt hourly workers (known as "associates"). Over the past five years, Wal-Mart has employed at any given time approximately 61,000 workers in California. Wal-Mart's biweekly payroll in California is approximately $60 million. McChristian Decl. ¶ 3; Nam Decl. ¶ 3.

All associates are eligible to accrue vacation and personal time off (collectively referred to hereafter as "vacation"). After one year of employment, accrued hours become "available" to full-time employees. Part time hourly associates accrue vacation beginning their second year. Associates can take vacation only once it becomes "available." Any paid time off used (such as vacation) is recorded in the computerized "time and attendance" database. Wigger Decl. ¶ 3, 4, 5, 8; Nam Decl. ¶ 3, 11.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                                                                                          Page 3
Slip Copy, 2008 WL 413749 (N.D.Cal.), 13 Wage & Hour Cas.2d (BNA) 680

Wal-Mart's regular biweekly payroll process is largely automated and centralized. Hours worked and recorded at each store in the prior two weeks are uploaded into a database and all calculations, deductions, and tax withholdings are processed, and corresponding pay checks and direct deposit pay statements are sent to each store the following Monday. In California, every other Thursday, associates may pick up their checks. The regular payroll is documented in a computerized payroll database. McChristian Decl. ¶¶ 4, 5.

**B. California's Final Pay Requirements**

***3** The California Labor Code contains certain final pay requirements prescribing the type of compensation due employees at the end of their employment, as well as the manner and form in which the final payments must be delivered to the employee. If an employee is discharged, "wages earned and unpaid at the time of discharge are due and payable immediately." Ca. Labor Code § 201. If an employee quits, wages are "due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice ..." in which case wages are due at the time of quitting. Ca. Labor Code § 202.6.

The employer has a statutory obligation to tender or deliver final pay. See Villafuerte v. Inter-Con Sec. Sys., Inc., 117 Cal.Rptr.2d 916, 96 Cal.App. 4th Supp. 45, 50 (2002) (in unpaid wage dispute, "an obligation to pay money requires that the payor tender or deliver payment to the payee."). Tender is to occur at the workplace premises. Ca. Labor Code § 208 (final pay must be at the place labor is performed). The employer is not to tender elsewhere, and is not permitted to mail final pay unless a quitting employee expressly "requests and designates a mailing address" to which final pay should be sent. Ca. Labor Code §§ 201, 202; Villafuerte, supra (if an employer mails the check without an express request, it bears the risk if payment is not received).

Additionally, on termination of employment, California accelerates the vesting of vacation and requires the monetary value of such "vested vacation time ... be paid ... as wages at [the employee's] final rate in accordance with such contract of employment or employer policy respecting eligibility or time served ...." Ca. Labor Code § 227.3. Under Wal-Mart's policies, associates accrue vacation for every "service hour," including hours up until termination. Wigger Decl. ¶¶ 4, 12, Exs. 1-3. Wal-Mart's computerized payroll system thus contains an inherent lag between when an associate records service hours (principally by time card swipes) and the time when the accrual on those hours, and thus the recording of additional vacation, occurs. The regular payroll system does not automatically record that an associate has used or should be paid vacation. Such data has to be entered manually into the database. Id. at 10, 11.

Finally, Labor Code section 203 provides that "[i]f an employer willfully fails to pay ... in accordance with Sections 201, 201.5, 202, and 205.5, any wages of an employee who is discharged or quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor[e] is commenced; but the wages shall not continue for more than 30 days."

**C. Wal-Mart's Final Pay Procedures**

Wal-Mart has an in-store, cash-based termination payout process. In Wal-Mart stores, Personnel Managers ("PMs") are tasked with the proper administration of payroll policies. They are in charge of processing and calculating final pay. PM Chart, ¶ 3. PMs are trained on final pay processes, and Wal-Mart's payroll webpage contains policies and procedures regarding final pay, with links to various policies (like payment of vacation). To process final pay, Wal-Mart uses a California Payout Worksheet that lists each potential component of the overall calculation, including "Vacation Hours (used)," "Vacation Hours (unused)," "Personal Hours (used)," and "Personal Hours (unused)." PMs also use a Termination Checklist, Exit Interview Form, and Separation Notice to document and process terminations and final pay. PM Chart, ¶¶ 4-6; Wigger Decl. ¶¶ 9, 18-21, Exs. 6-9. Upon learning that an associate has terminated employment, the PM calculates what the associate is owed using the California Payout Worksheet. The PM adds both "available" and "accrued" vacation, and determines the monetary value using the applicable wage rate. From this total, the PM calculates and deducts estimated taxes. If the associate is in the store, the associate is taken to the store's Cash Office, where the associate is paid in cash the amount on the Payout

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

worksheet. Copies of relevant documents are typically placed in the associate's personnel file. The Cash Office retains the Payout Worksheet and maintains its own log showing amounts paid in cash. At or about the time final payment is made, termination and final payout information is typically entered into the store's "SMART" system, which links to Wal-Mart's payroll system. McChristian Decl., ¶ 7; PM Chart, ¶¶ 7-12.

**\*4** After a cash payout, and at the end of the payroll period in which a termination occurs, the payroll process computes and calculates amounts owed and taxes to be withheld. If a cash payment has been made and that information keyed in, the cash payment will appear as a "draw" or advance payment. After calculating wages earned, debiting cash payments, and applying proper tax deductions, a positive, negative or zero amount may remain. Negative amounts are not recovered from the overpaid associate. Positive amounts become checks sent to the store which are then immediately tendered to the associate. Although all wages may have previously been timely paid, the electronic data may reflects payments as being made some days after termination. PM Chart, ¶ 13; McChristian Decl. ¶ 9.9.

Once an associate has been terminated, the associate must be at or return to the store to receive tender of the final payout. Wal-Mart asserts that any of the following scenarios may occur that would either prevent the associate from receiving final pay or result in the associate being paid late: the associate may decline to come in at all, or may ask that their monies be mailed; the associate may come in on a payday, pick up a normal payroll check, but neglect to pick up cash for accumulated vacation; or the associate may come in substantially later than when she or he was terminated and receive a cash payout, or cash plus a payroll check. PM Chart, ¶¶ 27, 28(a)-(d); Martin Decl. ¶ VI.C.1.

### *LEGAL STANDARD*

Class certification is governed by Federal Rule of Civil Procedure 23, which sets forth a two-step procedure. First, the Court must determine that the following four requirements of Rule 23(a) have been satisfied: (1) numerosity; (2) common questions of law and fact; (3) typicality; and (4) fair and adequate representation. Fed.R.Civ.P. 23(a). Once these requirements are met, the plaintiff must also show that the lawsuit qualifies for class action status under one of the criteria found in Rule 23(b).*See* Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1186 (9th Cir.2001), amended and superceded on denial of rehearing by Zinser v. Accufix Research Institute, Inc., 273 F.3d 1266 (9th Cir.2001) (noting that Plaintiff "bears the burden of demonstrating that [he] has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)").

Rule 23(b) requires that the plaintiff establish that either: (1) there is a risk of inconsistent adjudication, or adjudication of individual class member's claims would substantially impair non-party members' ability to protect their interests; (2) the defendant acted on grounds generally applicable to the class; or (3) common questions of law or fact predominate and class resolution is superior to other available methods. Fed.R.Civ.P. 23(b).

The plaintiff bears the burden of proving that certification is appropriate. *See* Hawkins v. Comparet-Cassani, 251 F.3d 1230, 1238 (9th Cir.2001). The Court maintains great discretion in certifying a class action. Vizena v. Union Pac. R.R. Co., 360 F.3d 496, 502 (5th Cir.2004). The Court must rigorously analyze whether the class action allegations meet the requirements of Rule 23. *See* General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). However, "[b]ecause the early resolution of the class certification question requires some degree of speculation ... all that is required is that the Court form a 'reasonable judgment' on each certification requirement."*In re Citric Acid Antitrust Litig.*, 1996 WL 655791 \*2 (N.D.Cal.1996)."In formulating this judgment, the Court may properly consider both the allegations of the class action complaint and the supplemental evidentiary submissions of the parties."*Id.* at \*2. The Court may also consider the manageability of trying the plaintiffs' claims in the form of a class action. Castano v. Am. Tabacco Co., 84 F.3d 734, 744 (5th Cir.1996).

### *ANALYSIS*

**\*5** The gravamen of plaintiffs' complaint is as follows: "there are approximately 145,000 former employees whose employment terminated (both voluntarily and involuntarily) during the class period,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and who were the victim of unpaid wages ... or untimely final pay as to last wages."Mot. at 3. Wal-Mart attacks plaintiffs' motion for class certification on the grounds that: 1) plaintiffs' proposed classes are fatally flawed in that they lack ascertainability; 2) the testimony of plaintiffs' expert related to the content of the electronic databases is so flawed as to be unreliable, and 3) because plaintiffs' claims will require independent proof for each terminated employee, individual issues will overwhelm this litigation and prosecuting this case as a class action will be unmanageable.

**I. Ascertainability**

An elementary prerequisite to certification is that the class sought to be represented must be "adequately defined and clearly ascertainable." *See DeBremaeker v. Short,* 433 F.2d 733, 734 (5th Cir.1970). An identifiable class exists if its members can be ascertained by reference to objective criteria. *See id. at 734-35* (declining to certify a class made up of Texas residents "active in the peace movement" because identification of members was dependent on their subjective states of mind).*See also Lukovsky v. City and County of San Francisco,* 2006 WL 140574 at *2 (N.D.Cal.2006) (denying class certification where class was not sufficiently ascertainable). The Court must be able to determine class members without having to answer numerous fact-intensive questions. *Daniels v. City of New York,* 198 F.R.D. 409, 414 (S.D.N.Y.2001).

Here, plaintiffs propose employing defendant's various payroll-related databases to ascertain the members of the subclasses. Specifically, plaintiffs' expert, Martin Shapiro, initially FN4 analyzed three electronic databases provided by Wal-Mart during discovery: the "Associate" database, which tracks employee time, attendance and payment records; the "Payroll" database, which contains the details of employee's payroll checks, including the hours and dollar amounts attributed to work, vacation, personal, and other payroll categories; and the "PeopleSoft" databases, which includes hire dates, termination dates, and termination reasons for each terminated employee. Shapiro Decl. ¶¶ 7-9. These databases are kept in the ordinary course of business by Wal-Mart, and are used by Wal-Mart to report their payroll tax liabilities to the state and federal governments. *See* Mot. at 5. Dr. Shapiro claims that by analyzing these three databases, he can determine, for each employee, the amount of vacation and personal time accrued but unpaid at the termination of employment (subclass 1), the amount of other wages due but unpaid at the time of termination (subclass 2), and whether and when final pay was received late by any particular employee (subclass 3). Shapiro Decl. ¶¶ 29-36.

> FN4. As explained in detail below, after Wal-Mart filed its opposition, Dr. Shapiro also analyzed a fourth database, the "Cash Office Database."

**\*6** Wal-Mart attack plaintiffs' motion for class certification on two principle grounds. First, it argues that Dr. Shapiro's methodology and calculations are so rife with errors as to make any reliance on them insufficient as a matter of law. Second, it argues that the databases analyzed do not contain the requisite information necessary to determine whether and when Wal-Mart's statutory duties to tender final pay were triggered, specifically, information related to the exact date an employee was terminated and whether and when the employee made himself available to pick up his final pay in-store.

**A. Dr. Shapiro's Methodology and Calculations**

Wal-Mart's expert, Dr. Denise Martin, argues that the numerous errors in Dr. Shapiro's calculations of unpaid or late final pay are so egregious as to make them inherently unreliable. Among the specific errors Dr. Martin identifies are:

> 1. Shapiro failed to consider the "Cash Office Database," which captures cash actually paid to employees, he fails to ascertain that on termination the associate was in fact paid earnings in cash at the store. Shapiro calculates damages for 13,080 claimants in this group, at $9.9 million. Martin Decl. ¶¶ I.1.b.; I.3.a.4.

> 2. Shapiro observes "negative" entries for vacation and personal time in the Payroll Database and concludes that such amounts were owed to associates but were wrongfully cancelled rather than paid. Shapiro Decl. ¶ 30, 31. He ignores other records, such as the Cash Office Database and termination and pay related documents contained in personnel files, that establish the associate was in fact paid in cash at the store. Martin Decl. ¶

Slip Copy    Page 6
Slip Copy, 2008 WL 413749 (N.D.Cal.), 13 Wage & Hour Cas.2d (BNA) 680

I.1.c.

3. Based on Shapiro's observation of multiple repetitions of such negative entries for vacation time across multiple pay periods, he erroneously adds them all up to arrive at damages that grossly exceed the amount of hours, if any, actually accumulated and owed. Martin Decl. ¶ I.1.d.

4. Shapiro misses cash payments *actually made* for available and accrued vacation and personal time but reported by the paying store by way of the time and attendance system only in gross amounts along with regular wages. The Payroll Database records the total as satisfying and, indeed, overpaying the regular wages that are then recorded in the Payroll Database as "Arrears." Shapiro does not credit the wage overage to the already paid vacation and personal time. Therefore, Shapiro sees damages where none exist. Dr. Martin concludes that 19,000 terminated associates show this phenomenon for which Shapiro calculates $13.5 million in damages. Yet these associates may have been fully compensated by cash draws. Martin Decl. ¶ I.1.a; I.3.a.iii.

5. Shapiro fails to consider critical information bearing on the timeliness of Wal-Mart's termination payments. Although California law requires Wal-Mart to tender payment at the associate's store (and to mail only if specifically requested), Shapiro cannot see in his data whether tender was made and ignores available evidence indicating that the associates for whom he has calculated damages failed to present themselves for tender of payment. Martin Decl. ¶¶ I.2. Wal-Mart argues that nothing in the databases Shapiro used shows or could show whether associates appeared to collect their payments. Indeed, the failure of large numbers of associates to collect could be expected (Shapiro does nothing to study this): more than one third, almost 49,000 of Shapiro's claimants, appear to have abandoned their jobs-walked off. Almost 1,500 failed to provide necessary employment documents or falsified them. Almost 500 associates were terminated because they died. Martin Decl. ¶ I .2.b. According to Shapiro's own methodology, one-third of the putative class members were owed less than $21; over 31,000 were owed less than $10; another 14,000 were owed between $10 and $21. Martin Decl. ¶ I.2.b

**\*7** Wal-Mart summarizes its indictment of Dr. Shapiro's analysis as follows: "Shapiro failed properly to analyze the data to the tune of millions of dollars. Coupled with these gross errors is the overriding problem that Shapiro relies on data not tied to the legal elements of Plaintiffs' claims. Shapiro's methodology cannot form the basis for class certification."Opp'n at 15.

This argument merits two responses. First, the alleged errors in Dr. Martin's analysis are not sufficient to prove that the specifics of class membership or damages cannot be adduced with the requisite precision from the databases available to the parties; indeed, to the contrary, the precision with which Dr. Martin was able to identify and correct the errors in Dr. Shapiro's calculations only illustrates the degree to which the needed information *can* be extracted from the databases with the requisite precision. The fact that plaintiffs' calculations were faulty does not show that the databases cannot be used to determine class membership and damages, and Dr. Martin's "correction" of Dr. Shapiro's analysis only serves to satisfy the Court that this information can be extracted with reasonable precision by competent experts. Indeed, Dr. Martin herself stated that she believes the errors in Dr. Shapiro's analysis can be corrected. *See* Martin Depo. at 66:10-12;16:10-161:20.

Second, as plaintiffs point out, while Wal-Mart devotes page after page to cataloguing the deficiencies in Dr. Shapiro's analysis, nowhere does it attempt to quantify the degree to which the errors affected the numbers in Dr. Shapiro's analysis. Just days after receiving Dr. Martin's declaration, Dr. Shapiro re-performed his calculations taking into account Dr. Shapiro's criticisms, and specifically incorporating the Cash Office Database. The results of Dr. Shapiro's re-calculation were that, taking into account Dr. Martin's corrections, his original calculations were off by only a marginal amount. For example, taking into account the data in the Cash Office Database only affected Dr. Shapiro's calculations by 0.02 percent-a miniscule fraction. *See* Shapiro Rely Decl. ¶ 11. Thus, while Wal-Mart makes heavy weather of the errors in Dr. Shapiro's calculations, the errors themselves are either negligible or easily identifiable and correctable.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Finally, at the class certification stage, "robust gatekeeping of expert evidence is not required; rather, the court must query only whether expert evidence is 'useful in evaluating whether class certification requirements have been met.'" *Kurihara v. Best Buy Co., Inc.* 2007 WL 2501698, *5 (N.D.Cal. August 30, 2007) (Patel, J.) (citing *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 191 (N.D.Cal.2004)). The parties, through their class certification briefing, are in the process of refining Dr. Shapiro's analysis. Whether or not his calculations are ultimately correct is a matter more appropriately raised at the merits stage, and need not be reached at the class certification stage.*Id.*

**B. Incompleteness of the Databases**

**\*8** However, Wal-Mart's argument that nothing in the databases Shapiro analyzed "shows or could show" whether or when associates appeared to collect their payments has more force, and is in fact fatal to the certification of Subclass No. 3. As Wal-Mart is at pains to point out, the California final pay statutes (Labor Code §§ 201, 202) are triggered not only by termination of employment, but by the associate performing his or her duty to be at the store to receive tender of final pay or to give Wal-Mart specific mailing instructions. *See*Labor Code § 208. As stated by the Division of Labor Standards Enforcement ("DLSE"):

> Labor Code section 208 further provides that the wages of an employee who quits shall be paid at the office or agency of the employer in the county where the employee has been performing labor. You are correct when you state that this provision would require the quitting employee to return to the office or agency where the employee has been performing labor to collect his or her wages. You are also correct in stating that waiting time penalties would not accrue to an employee who fails to return to the place of employment 72 hours after quitting (unless, of course, the employee has given at least 72 hours prior notice of intention to quit in which event the wages are due at time of quitting (Labor Code section 202).).

*See*Docket No 166, Ex. C (DLSE Op. Ltr.1986.09.15). Accordingly, whether and when waiting time penalties attach will depend, for each employee, on whether and when they provided notice of termination to Wal-Mart and whether or when they either returned to the store to pick up their final pay or provided Wal-Mart with an address to send it to. This information is not contained in any of the electronic databases at issue, but can only be determined by an individual review of each potential class member's personnel file.

The case of named plaintiff Barry Smith is illustrative of this shortcoming. Smith was terminated on Friday, December 17, 2004. Smith Depo. 52:20-53:18. Smith claimed he "didn't think about" asking for final wages, and left the store. *Id.* 75:21-76:20.Instead, Smith went home, received a message about a sick relative, made immediate travel arrangements, and flew on the same day to Michigan. *Id.* at 71:2-75:20.Smith did not return to the store until January 2, 2005 when he received the full amount of all sums owed to him through December 17. *Id.* at 79:4-23, 84:6-85:21, 91:9-92:11, 99:13-20, 151:21-152:12, 189:8-192:7.However, Shapiro, examining the electronic databases, concluded that Smith was paid "late." Shapiro claims that the payroll database demonstrates that Smith was terminated December 18, 2004 and paid on December 24, 2004. Martin Decl. ¶ VI.F.3; Shapiro Depo. 35: 11-18.13. However, the databases available to Shapiro simply do not reflect that Smith was paid "late" because he in fact did not return to the store to receive his pay until two weeks after he was terminated.

**\*9** Plaintiffs concede Subclass No. 3 presents "unique certification issues," and specifically concede that the electronic databases may fail to accurately record 1) the termination date of employees in Subclass No. 3 who voluntarily terminated their employment with defendant, and 2) the date employees made themselves available for tender of their final pay. *See* Reply at 19 ("The existing computerized records do contain termination dates, but further investigation may be required to determine if they accurately reflect the actual termination date in relation to the wage continuation requirement of Labor Code § 203."). Nevertheless, plaintiffs argue, Wal-Mart's "failure to keep accurate records" should not become a bar to recovery by the class, and instead propose various sampling methods to reach a "reasonable estimate of the average number of days late final full pay was tendered to members of Subclass No. 3."*See* Reply to Response

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

to Proposed Trial Plan at 14-15, citing *Anderson v. Mt. Clemens Pottery* 328 U.S. 680, 687-688, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) (award of back wages will not be barred for imprecision where it arises from the employer's failure to keep records).

However, plaintiffs have provided nothing suggesting that Wal-Mart is statutorily obligated to keep accurate electronic databases indicating when employees informed them that they would be quitting (as opposed to the actual termination date), or when associates made themselves available for tender of their final pay. While it is true that, were it Wal-Mart's obligation to keep accurate electronic databases reflecting this information, the failure to maintain adequate records would not serve as a bar to class certification, here, this obstacle is simply insurmountable with respect to Subclass No. 3. Accordingly, the Court finds that proposed Subclass No. 3 lacks ascertainability and will not be certified.[FN5]

> FN5. Wal-Mart also curiously asserts, without any apparent basis in fact, that the unpaid wages reflected as being "on the books" in the databases might be unpaid because the employee never came to collect their final pay, and therefore the same issue that is fatal to Subclass No. 3 is also fatal to the other subclasses. *See* Opp'n at 24; Martin Decl. ¶ V. However, Dr. Shapiro asserts, and Wal-Mart does not deny, that the entries in the databases were created contemporaneously with either a final cash payout or the cutting of a final pay check, and Shapiro assumes that the employee received the final pay as calculated by Wal-Mart. *See* Reply at 3; Shapiro Decl. ¶ 31. The question is therefore one of faulty calculations of final pay by Wal-Mart, not whether the amounts as calculated were ever received; the issue of whether or not an employee came in to pick up his or her final pay is simply not relevant to Subclasses Nos. 1 and 2.

The following discussion, therefore, only applies to Subclasses Nos. 1 and 2.

**II. Rule 23(a) Requirements**

In order to determine whether class certification is appropriate with respect to Subclasses Nos. 1 and 2, the Court must determine whether (1) the plaintiffs are so numerous that joinder is impractical; (2) there are questions of law or fact common to the class; (3) the named plaintiffs' claims are typical of those of the rest of the class; and (4) the named plaintiffs can adequately protect the interests of the class. *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992); Fed.R.Civ.P. 23(a).

**A. Numerosity**

Rule 23(a)(1) requires that the proposed class must be so numerous that a joinder of all members is impracticable. Here, plaintiffs assert that, according to defendant's payroll records, there are over 135,000 potential members of Subclass No. 1 and over 27,000 potential members of Subclass No. 2 (many of whom are also members of Subclass No. 1). Defendant has not disputed that plaintiffs have met the numerosity requirement, and the Court finds that joinder of all members would be impractical.

**B. Commonality**

*10 Rule 23(a)(2) requires that common questions of law or fact exist among the members of the proposed class. This commonality been construed permissively: "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."*Hanlon v. Chrysler Corporation,* 150 F.3d 1011, 1019 (9th Cir.1998). Here, Plaintiffs argue the following common questions of fact and law are present:

> i. Do Wal-Mart's computerized records establish that the members of Subclass No. 1 have not been paid all accrued vacation/personal pay upon termination?

> ii. Has Wal-Mart violated Labor Code sections 200, 201, 202 and 227.3 by failing to pay all accrued vacation/personal pay to members of Subclass No. 1?

> iii. Do Wal-Mart's computerized records establish

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that the members of Subclass No. 2 have not been paid all other earned and unpaid wages upon termination?

iv. Has Wal-Mart violated Labor Code sections 200, 201, 202 and 218 by failing to pay all earned and unpaid wages (excepting accrued vacation/personal pay) to members of Subclass No. 2?

v. If Wal-Mart has violated the provisions of the Labor Code in relation to the payment of vacation and personal pay to members of Subclasses 1 and 2, was that failure willful under California law so that waiting time penalties pursuant to Labor Code section 203 should be imposed?

vi. Has defendant violated the provisions of Business & Professions Code sections 17200, et. seq. by acting unlawfully in not complying with the provisions of Labor Code section 227.3? FN6

> FN6. In its May 29, 2007 order, the Court dismissed the unfair business practices claim insofar as it was based on violations of anything other than Labor Code § 227.3.

Wal-Mart argues that plaintiffs have failed to meet the commonality requirement on the same grounds that it argues the classes are not ascertainable, i.e., that proof of the trigger of statutory final pay obligations under California law and Wal-Mart's discharge of those obligations requires examination of the circumstances of each terminated associate. *See* Opp'n at 35. The Court has already dispensed with this argument above, and in any case it is largely moot given that Subclass No. 3 will not be certified.

Wal-Mart also argues that the question of whether Wal-Mart willfully failed to pay its employees cannot be determined without an individualized inquiry into the circumstances surrounding the disbursement of each employee's final pay. Imposition of Labor Code section 203 penalties requires proof that "an employer *willfully* fails to pay ... any wages of an employee who is discharged or who quits" (emphasis added). Plaintiffs contend in response that individual assessments are unnecessary because Wal-Mart's store-oriented final pay system is inherently, and, apparently, intentionally, inadequate. Plaintiffs charge that, in essence, Wal-Mart "willfully" failed to pay terminated associates by intentionally using a final pay system that protects against overpayment of employees but does not include any similar protections against underpayment.FN7 Wal-Mart replies that it is "entitled to have the factfinder consider whether final pay shortcomings are based solely or at least largely on individual mistakes or departures from Wal-Mart policies and procedures." Opp'n at 29.

> FN7. Plaintiffs contend that Wal-Mart makes use of a computer programs that tracks for overpayment to employees, but does not employ a program similarly tracking for underpayment. Mot. at 24.

*11 However, as plaintiffs frame this issue, it does not appear to require individual inquiries into the circumstances surrounding each employee's final pay. The essence of plaintiffs' willfulness claim is that, given the fact that errors in final pay will inevitably take place, particularly given the number of Wal-Mart employees and their high turnover rate, by turning a "blind eye" to underpayments but not overpayments Wal-Mart is effectively assuring itself that it will realize a net gain as a result of final pay errors, and is therefore in essence intentionally "allowing" employees to be underpaid. *See* Reply at 16. In other words, plaintiffs allege that Wal-Mart has intentionally implemented a system that will ensure underpayments, i.e., it is willfully underpaying its employees. While plaintiffs do not specify what proof they intend to offer at trial on this claim, there appears to be nothing related to the issue of the implementation and monitoring of Wal-Mart's final pay system that inherently requires the finder of fact to delve into tens of thousands of employee files; as plaintiffs put it, this appears to be a "corporate-level" issue.

Accordingly, the Court finds that plaintiffs have met the commonality requirement of Rule 23(a).

### C. Typicality

Rule 23(a)(3) requires that the claims of the plaintiffs be typical of those of the members of the proposed class. The typicality requirement focuses on the similarity between the lead plaintiff's legal theories and those of the people he or she purports to represent. *Lightbourn v. County of El Paso,* 118 F.3d

421, 426 (5th Cir.1998).

Plaintiffs Ballard, Wiggins and Lyons are all former employees of defendant and claim that they were not, and still have not, been paid all earned vacation pay, personal time and other wages upon termination. They all make claims falling under the auspices of Subclasses Nos. 1 and 2.[FN8] Wal-Mart argues that Ballard and Wiggins were, in fact, paid in full upon termination. *See* Opp'n at 34. However, the fact that Wal-Mart disputes the amount of damages, if any, suffered by a proposed representative plaintiff does not prevent the proposed plaintiff from acting as a class representative. Disputes concerning the existence or amount of damages a potential class representative suffered are more appropriately addressed at the merits stage. *Yamner v. Boich,* 1994 WL 514035, *5 (N.D.Cal. Sept.15, 1994) (finding that disputes about amount of damages suffered by proposed class representative "do not have relevance in determining class certification."). Differences in the degree of harm suffered, or even in the ability to prove damages, do not vitiate the typicality of a representative's claims. *In re Citigroup Pension Plan Erisa Litigation,* 241 F.R.D. 172, 178 (S.D.N.Y.2006); *Sanders v. Faraday Laboratories, Inc.,* 82 F.R.D. 99 (E.D.N.Y.1979) (inability to prove damages does not reflect adversely upon typicality under Rule 23.); *see also* Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3:10 at 271 (4th ed.2002). ("A class representative need not show a probability of success on the merits to maintain a class action."). With respect to plaintiff Lyons, Wal-Mart acknowledges that he was underpaid by $10.30 upon his termination. *See* Opp'n at 11; Martin Decl. ¶ VI.F.

> FN8. Plaintiff Smith claims that, although ultimately paid all wages by defendant, he was paid late in violation of Labor Code § 201, and is therefore offered by plaintiffs as the named plaintiff for Subclass No. 3. However, as Subclass No. 3 will not be certified, Smith cannot served as a representative plaintiff.

*12 Thus, while the Court has concerns about whether Ballard and Wiggins actually suffered damages,[FN9] this issue is more properly addressed at the merits stage. Moreover, there is no dispute that plaintiff Lyons was in fact underpaid by $10.30. It is well settled that neither the number of representative parties nor their financial interest is controlling in determining whether the plaintiffs will fairly and adequately protect the interests of their class; even a single plaintiff may represent the entire class, no matter how small his or her claim may be, if other factors indicate that he or she will fairly and adequately protect the interests of the class.*Epstein v. Weiss,* 50 F.R.D. 387, 391 (E.D.La.1970). Accordingly, the Court finds that the typicality requirement is met with respect to Ballard, Wiggins, and Lyons. Plaintiff Smith is not a member of either class and therefore cannot serve as a representative plaintiff.

> FN9. Plaintiffs offer no reply to Wal-Mart's arguments that Ballard and Wiggins were overpaid, and thus appear to concede as much. Nevertheless, as noted above, the weight of authority is that proof of damages for potential class representatives is not germane at the class certification stage; it is enough that the proposed representative's *claims* are typical.

**D. Adequacy of Representation**

Rule 23(a)(4) requires that plaintiffs be able to "fairly and adequately protect the interests of the class". To establish adequacy of representation, plaintiffs must show that (1) their interests are common with, and not antagonistic to, the classes' interests; and (2) that they are "able to prosecute the action vigorously through qualified counsel."*Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir.1978).

There is no evidence that any plaintiff has any conflict of interest with any member of the proposed class. *See* Marlin Decl ., ¶ 19. Plaintiffs' counsel has investigated the claims of the class through discovery, depositions, etc.*Id.* Plaintiffs' counsel have filed declarations establishing their substantial experience in the litigation of class actions, and in particular the litigation of employment related matters. *See id.*Defendant has not raised any challenge to the competency of plaintiffs' counsel. Accordingly, the Court finds that the adequacy of representation requirement is met.

**III. Rule 23(b)(3) Requirements**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Under Rule 23(b)(3), the Court must find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.Fed.R.Civ.P. 23(b)(3). The matters pertinent to a finding under Rule 23(b)(3) include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and, (d) the difficulties likely to be encountered in the management of a class action.*Id.*

The objective behind the two requirements of Rule 23(b)(3) is the promotion of economy and efficiency in actions that primarily involve monetary damages. *See*Fed.R.Civ.P. 23(b)(3) advisory committee notes. When common issues predominate, true economy may be achieved through the class action device, as time, effort and expense can be saved as compared to individual suits, and the confusion over differing outcomes can be avoided. *Id.*

**A. Common Questions of Law and Fact**

**\*13** "Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and the issues involved."*Romero v. Producers Dairy Foods, Inc.,* 235 F.R.D. 474, 489 (E.D.Cal.2006). The arguments related to whether common issues predominate are essentially identical to those related to ascertainability and commonality as addressed in section II.B. above, and Wal-Mart has not persuaded the Court that individual issues will overwhelm this litigation.

Plaintiffs have established through the declarations of their expert that they meet the requirement of predominance of common factual issues by use of the records common to members of the proposed class. See *In re Relafen Antitrust Litigation,* 218 F.R.D. 337, 343-344 (D.Mass.2003) (predominance requirement satisfied in part by expert declaration showing class wide existence of injuries from common unlawful conduct); *In re Cardizem CD Antitrust Litigation,* 200 F.R.D. 326, 348-351 (E.D.Mich.2001) (expert testimony in support of class certification satisfied plaintiffs' burden of showing that there was an accepted methodology for calculating aggregate damages resulting from allegedly unlawful agreement between manufacturers of brand-name drug and generic version).

**B. Manageability of the Litigation**

Wal-Mart argues that proceeding with this litigation as a class action will be unmanageable because "Wal-Mart will need and must be permitted to present documents and live witness testimony regarding each class member who Plaintiffs claim did not have the full amount of his/her wages timely made available."Opp'n at 32. Allotting 15 minutes for each of the 145,000 members of the class, Wal-Mart concludes that the trial will last 16 years. Plaintiffs counter that the only true issue is the accuracy of Wal-Mart's own databases, which Wal-Mart concedes it uses to calculate its tax liabilities.

As issues related to the timing of the payments are no longer in play because Subclass No. 3 will not be certified, Wal-Mart does not identify any specific issues for which individual proof will be necessary. Plaintiffs have satisfied the criteria of Rule 23(a) and Rule (23)(b)(3). Class certification is appropriate.

**C. Wal-Mart's Due Process Concerns**

Wal-Mart argues that the amount of section 203 penalties at issue here (roughly 30 day's pay for each employee who has been willfully underpaid) raises the specter of unconstitutionally disproportionate damages. For example, Wal-Mart concedes that plaintiff Lyons has been underpaid by $10.30. If plaintiffs succeed in proving Wal-Mart willfully underpaid him by this amount, Wal-Mart would be subjected to a penalty of approximately $2,400 (based on Lyons' $10.10 per hour wage rate). Such a penalty would be almost 240 times the $10.30 payment short. According to Wal-Mart, given the disproportionate nature of the potential penalties in this case, the Court will be forced, in order to adequately provide Wal-Mart with due process of law, to engage in a case-by-case analysis of whether the penalties imposed by section 203 would be unconstitutionally high for each of the 145,000 class members. See *Hale v. Morgan,* 22 Cal.3d 388, 149 Cal.Rptr. 375, 584 P.2d 512 (1978) (where a penalty

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

statute is based on an automatic formula, courts are directed to use discretion to limit particular penalties to constitutionally permissible amounts). As Wal-Mart puts it: "The Court will have to identify each individual case where a penalty raises the specter of a constitutional violation. In those cases, the Court would then need to apply the constitutional analysis, which requires an examination of the facts of the particular case where there was delay or underpayment."Opp'n at 30.

***14** However, this argument misconstrues the nature of plaintiffs' willfulness claim: plaintiffs allege, in essence, that Wal-Mart engaged in a systemic, corporate-level scheme to intentionally underpay its employees. As already discussed above, this inquiry does not appear, at least on the arguments and evidence currently before the Court, to require any inquiry into the individual circumstances surrounding each individual's underpayment. Similarly, the assessment of a penalty would be at the class-wide level. Thus, under the worst case scenario for Wal-Mart, assuming that plaintiffs are able to prove that Wal-Mart willfully underpaid its employees to the tune of $25,000,000, Wal-Mart could conceivably be liable for a penalty of approximately $348,000,000 [FN10](theoretically assuming that Lyon's $2400 penalty is typical of the class members). However, as plaintiffs point out, the constitutionality of section 203's 30-days'-wage penalty has been repeatedly upheld. See Davis v. Morris, 37 Cal.App.2d 269, 274, 99 P.2d 345 (1940) ("The legislature has seen fit to impose the penalty for wilful failure to pay wages when they are due. We may not question the propriety of that legislation ."); Moore v. Indian Spring Channel Gold Mining Co., 37 Cal.App. 370, 174 P. 378 (1918). Moreover, it is simply premature to speculate at this point whether such a penalty would be unconstitutionally large; in any case, such a determination would not appear to require the Court to examine each of the 145,000 class members' claims on a case-by-case basis, and therefore this concern does not impact the Court's Rule 23(b)(3) analysis.

> FN10. While this figure is a large one, Wal-Mart has reminded the parties and the Court of the scale of Wal-Mart's operations: Wal-Mart's biweekly payroll in California alone is approximately $60 million. Opp'n at 4.

### D. Other Litigation

Wal-Mart argues that the proposed class in this action overlaps substantially with the classes certified in *Savaglio v. Wal-Mart Stores, Inc.,* Cal.Super. Ct., Alameda County, Case No. C-8356877.As the court in that case summarily adjudicated certain causes of action pertaining to penalties under section 203, Wal-Mart argues that the judgment in that case has a preclusive effect on the class members in the instant case. Additionally, Wal-Mart argues that a recent settlement reached between Wal-Mart and the DLSE regarding the late payment of final payments, which Wal-Mart states overlaps with the claims in the instant action, may raise "significant additional issues related to release/and or waiver."SeeDocket No. 146 at 7.

While Wal-Mart suggests that, under the present circumstances it may be appropriate for the Court to abate this action, no motion to that effect is before the Court, and Wal-Mart's cursorily briefed concerns related to the potential preclusive effect of other litigation related to final pay are an insufficient basis for this Court to deny certification.

### IV. Motions to Strike and Evidentiary Objections

The parties spilled much ink over the reliability and admissibility of Dr. Shapiro's testimony. However, as noted above, it is not necessary for the Court to engage in a full-fledged *Daubert* analysis at the class certification stage."[R]obust gatekeeping of expert evidence is not required; rather, the court must query only whether expert evidence is 'useful in evaluating whether class certification requirements have been met.'"Kurihara, 2007 WL 2501698, *5. While Defendant's surreply brief describing the further errors in Dr. Shapiro's calculations even in his "corrected" supplemental declaration raises some concerns about Dr. Shapiro's competence (or at least his attention to detail) (*see*Docket No. 224, Exh. A), nevertheless, on the evidence currently before the Court, the Court has determined that his testimony is "useful in evaluating whether class certification requirements have been met."Kurihara, 2007 WL 2501698 at *5. Accordingly, Wal-Mart's objections to Dr. Shapiro's declaration [Docket No. 167] are OVERRULED.

**\*15** Similarly, the motion to strike Dr. Shapiro's

Supplemental Declaration [Docket No. 224] is DENIED; Dr. Shapiro's supplemental testimony was offered in response to Wal-Mart's arguments in its opposition and did not raise new matters that should have been raised in his initial declaration. *See Sweet v. Pfizer,* 232 F.R.D. 360, 364 & n. 6, n. 7 (C.D.Cal.2005), (court may, in its discretion, consider evidence submitted in reply brief "to the extent that it replies to arguments raised in the Opposition and does not raise new issues or introduce new information."). Wal-Mart's request for leave to file a surreply is GRANTED. The parties' requests for judicial notice are GRANTED.

## CONCLUSION

Accordingly, Plaintiffs' Motion for Class Certification is GRANTED as follows.

1. The Court certifies the following class:

   All former California employees of defendant Wal-Mart Stores, Inc. whose employment ended during the period from March 20, 2002 through and including the date a judgment is rendered in this matter and who, based upon Wal-Mart's computerized records, are members of one of the following Subclasses:

   *Subclass No. 1:* Class members who, according to Wal-Mart's computerized records, have not been paid all accrued and unused vacation and personal time they earned while employed by defendant.

   *Subclass No. 2:* Class members who, according to Wal-Mart's computerized records, have not been paid all wages they earned while employed by defendant. As used in this proposed Class Definition, the term "wages" includes hourly pay, salary, and geographical assistance pay.[FN11]

   > FN11. The Court has modified this subclass definition slightly to avoid redundancy contained in the version proposed by plaintiffs.

2. The Motion is DENIED with respect to Subclass No. 3.

3. The Court appoints Michael Wiggins, Denton Ballard, and Nathan Lyons as class representatives, and the following law firms to act as class counsel: Marlin & Saltzman, Schwartz Daniels & Bradley, Peter M. Hart Law Offices, and Bailey Pinney P.C.

4. Class counsel shall prepare a proposed form of class notice and shall meet and confer with defendant's counsel concerning the same. Any agreed upon notice shall be presented to the Court for approval within 30 days of the date of this order. In the event the parties cannot agree upon the form of notice, each side shall file their proposed version for consideration by within 60 days of the date of this order The Notice shall permit class members to opt-out of the class if they so desire within 30 days of notice having been sent.

5. Notice shall be provided to the class via U.S. Mail to the last known address reflected on Defendant's records. Defendant shall cooperate with class counsel in preparing a computerized mailing list as required.

6. Class Counsel shall establish a web-site to assist with communication with members of the class, and to permit members of the class to provide updated address information.

IT IS SO ORDERED.

N.D.Cal.,2008.
In re Wal-Mart Stores, Inc. Wage and Hour Litigation
Slip Copy, 2008 WL 413749 (N.D.Cal.), 13 Wage & Hour Cas.2d (BNA) 680

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.